## No. 6633.

.NEW ORLEANS NATIONAL BANK, MRS. A. B. BARANCO, SUBROGEE, VS. JOSEPH RAYMOND.

| 29 | 355 |
|----|-----|
| 52 | 1554 |

| 29 | 355 |
|----|-----|
| d120 | 1031 |

No petitory action; or action to annul, can be instituted by rule.

A party can not impeach the title of his transferror.

All buildings put on mortgaged real estate by the owner, are immovable, and become subject to the mortgage on the real estate.

A mortgage creditor can not be prejudiced by any contract made by his debtor, to which he is not a party.

The revenues of a property, which belong to the owner of the property, can not be seized, and sold separately from the property.

. Any party in interest may proceed by rule to remove any thing which illegally clouds a title.

A bank organized under the national banking act may sell any immovable it owns, and reserve a mortgage, and vendor's privilege on it.

APPEAL from the Fifth District Court, parish of Orleans. *Cullom*, J.

*Charles Louque* and *Carleton Hunt*, for Joseph Billgery, plaintiff in rule and appellee.

*McGloin & Nixon* and *Magruder & Richardson*, for Mrs. A. B. Baranco, appellant.

The opinion of the court was delivered by

SPENCER, J. The Union National Bank of New Orleans sold to Joseph Raymond by authentic act of date the twenty-seventh of February, 1873, a certain parcel of ground in the square bounded by First, Second, Dryades, and Baronne streets, for the price of $14,666 66, one-fifth of which was paid in cash, and for the balance Raymond executed notes at one, two, three, and four years, secured by special mortgage and pact of *non alienando* on the property.

On the tenth of April, 1873, Raymond entered into a contract with the city of New Orleans, acting through its mayor under ordinance No. 2041 administration series. By that contract Raymond bound and obligated himself in substance to erect on said grounds a market-house according to certain specifications; to free the property of all mortgages and incumbrances on or before the completion of said building, and to keep

the market as required by the city ordinances, etc. Raymond during the first ten years was to receive all the rents and revenues. At the expiration of the first ten years the city was for the next ten years to farm out the market and take all the rents and revenues in excess of five hundred dollars per month, or six thousand dollars per year; the rents up to said amounts to be paid to Raymond, his heirs, or assigns. At the end of this second term of ten years, Raymond was to transfer the grounds and market in full ownership to the city, binding himself not to alienate or incumber the same to the prejudice of this agreement.

On the tenth of March, 1874, the New Orleans National Bank obtained judgment on a bill of exchange for seven hundred dollars against Joseph Raymond, issued execution thereon, seized, and, on the twenty-fourth of July, 1876, sold and purchased for one hundred and fifty dollars "all the right, title, and interest of Joseph Raymond in, to, and under the contract made with the city of New Orleans of date April 10, 1873." * * * "The said act of April 10, 1873, conferring upon him the right to the revenues of a market constructed by him at the corner of Second and Dryades streets, in the square bounded by Second, First, Dryades and Baronne streets, for the term of twenty years," etc.

On the fifth of September, 1876, said New Orleans National Bank sold and transferred, in consideration of the amount due it, with subrogation, to Mrs. Baranco, all its rights in, to, and under said judgment and purchase.

On the twenty-fourth of May, 1876, the Union National Bank, under executory process against Raymond upon said vendor's mortgage, seized the above-described lots of ground, " together with all the buildings and improvements thereon," and advertised the same for sale on the first of July, 1876.

On June 29, 1876, Joseph Billgery purchased and was subrogated to the judgment in the case of "Andrew G. Downey vs. Joseph Raymond," for some twelve hundred and fifty dollars, being for work done on said market buildings.

On the first of July, 1876, the day of sale, Joseph Billgery paid to the Union National Bank the mortgage note due, and the sale was not made. Subsequently he took up and paid the remaining outstanding vendor's note held by the Union Bank. Billgery did not take a formal act of subrogation at the time of his payment on the first of July, but on the second of August, 1876, the bank gave him a receipt and subrogation to its rights.

Billgery, as subrogee of Union National Bank, caused said property to be re-advertised for sale on February 10, 1877, and re-advertised again for sale on March 3, 1877.

On the twenty-fourth of February, 1877, he commenced the proceed-

ing now before us, being a rule taken on Mrs. Baranco to show cause why the act of adjudication by the sheriff to the New Orleans National Bank above described (to which she had been subrogated) should not be erased and canceled from the books of the office of conveyances, for the reason that the same is null and void and operates injuriously to him (Billgery) as a cloud upon the title of said property.

Mrs. Baranco pleads by way of exception and answer in substance as follows:

First—That plaintiff in rule, not being a party to the suit of the New Orleans National Bank vs. Joseph Raymond, can not proceed in this summary manner to set aside the adjudication, and should proceed by direct action.

Second—That the pretended mortgage to the Union National Bank is void, as taken in contravention of the laws of the United States creating national banks; that said bank under said laws is prohibited from owning real estate and from taking or holding mortgages thereon under the circumstances of this case.

Third—That the mortgage to the Union National Bank has been extinguished by payment, and that said Billgery was not subrogated thereto.

Fourth—She alleges her ownership of the rights of Raymond under the said contract with the city, and that she is entitled thereby to the rents and revenues of said market in the hands of the sheriff.

Fifth—By way of reconvention she prays and demands the nullity of Billgery's pretended mortgage rights and for their cancellation, and that she be declared entitled to the revenues of said market.

Upon these issues the case was tried. There was judgment for plaintiff ordering the erasure and cancellation of Mrs. Baranco's title, and decreeing its nullity. She prosecutes this appeal.

The first question naturally presenting itself is whether or not the plaintiff, Billgery, has the right to proceed by rule and in a summary manner as he has done. This depends upon the nature of Mrs. Baranco's rights. Plaintiff can not bring a petitory action by rule, nor can he institute an action of nullity in that manner. Her counsel insists truthfully that she did not buy the market property itself, but only Raymond's rights under the contract with the city to take its revenues. He asserts that under said contract with the city the market building, though put by Raymond at his own proper expense upon the ground bought by him from the bank, did not constitute a part of the realty, but was a *mere movable*, and not subject to the bank's vendor's mortgage. He further argues that under the said contract with the city the property was inalienable, and therefore, even if the building was *immovable*, it was *not mortgageable.*

These propositions are, upon purely elementary principles, utterly untenable. The bank was admittedly owner of the lots. Both parties claiming under the bank, neither can or does dispute its title. The bank sold these lots to Raymond. Raymond became the owner. Raymond, the owner, at his own proper cost, put a building on these lots. The building thereby became immovable by accession and a part of the soil. Raymond therefore owned the soil with the building on it. The bank had its mortgage (if any existed) upon the soil and the building as its accessory. O. C. C. 455, 496, 497, 498.

These consequences and principles flow from the laws of the State, which are paramount and must govern. The contract between Raymond and the city could not affect the legal rights of the bank. It would be strange, indeed, if a vendee, owing part of the price, could deprive his vendor of recourse upon the property sold, by entering into a contract with a third person declaring the property inalienable, or by agreeing to put buildings on it which he stipulates shall not be subject to the vendor's claim, or by promising to transfer the land and buildings to such third person at a future day.

We have seen that Raymond owned the land and the building, and that both were subject to the bank's mortgage, the land and building being in reality but one piece of real estate. Raymond's interest in and to the future revenues of this property could not be sold distinctly and separately from the property itself. He did not derive his right to its revenues from the city, but from his ownership. His contract with the city *put restrictions* upon *his* rights, but did not create them. But it is manifest that no agreement between Raymond and the city could affect the rights of the bank.

We regard the seizure and sale of Raymond's interest in the future *revenues* of a property of which *he was owner* as utterly null and void; for where the rights of ownership and enjoyment are vested in one and the same person they constitute a unity, a single thing, and can not be seized and sold separately. They must be seized together, or not at all.

We conclude, therefore, that the rights so-called of Mrs. Baranco are mere appearances without substance, and as the inscription of her deed is calculated to injure the rights of persons claiming or owning said property, any party showing an interest may proceed summarily to have the cloud removed. See 2 An. 650.

It therefore only remains for us to inquire whether Joseph Billgery shows an interest in having this done.

He claims to be subrogee of the vendor's mortgage held by the Union National Bank. If that be a valid mortgage and he be the holder of it, his demand is well founded.

Counsel for defendant in the rule urges strenuously that the mortgage

in favor of the bank was in its inception null and void, as violative of the national bank act.  He admits that the bank was the owner of the lots in question, but contends that it could not sell them on a credit, reserving a mortgage and privilege for the price, and that such mortgage and privilege were absolutely void.  The twenty-eighth section provides as follows:

"And be it further enacted, That it shall be lawful for any such association to purchase, hold, and convey real estate as follows:

" First—Such as shall be necessary for its immediate accommodation in the transaction of its business.

" Second—Such as shall be mortgaged to it in good faith for debts previously contracted.

" Third—Such as it shall purchase at sales under judgments or decrees or mortgages held by such association, or shall purchase to secure debts due to said association.

" Such association shall not purchase or hold real estate in any other case or for any other purpose than as specified in this section," etc.

As stated, there is no dispute as to the bank having been owner of the lots, and therefore it must have acquired in some one of the modes specified in the act.  The act gives authority to *purchase* under certain *restrictions*, but there is no restriction upon the power " to convey."  The intent and policy of the law is manifest.  It was to discourage, to prevent, the accumulation of real estate in the hands of these banks.  But if such was the intent, it would be strange if the power and right " to convey," to sell, were restricted.  We would expect the largest liberty in this direction, as being in furtherance of purposes of the lawgiver.  It is unreasonable to conclude that because the law gives the power to do business " by loaning money on personal security," and restricts the right to purchase real estate, that therefore it forbids the sale of such real estate as may have been lawfully acquired upon the usual and customary terms of the commercial world, and strikes with nullity such vendors' liens and mortgages as may be retained to secure deferred parts of the price.  If defendant's theory be right, then a national bank in Louisiana can not sell real estate on a credit at all, even without mortgage, for under our law the vendor has for his security, by mere operation of law, both his lien and the right of resolution of the sale, which would constitute *real* securities for debt in violation of the banking act.  We conclude therefore that there is nothing in the law preventing a national bank from selling its real estate on terms of credit and reserving a mortgage to secure the price.

The remaining question is, was Billgery subrogated to the bank's mortgage?  It is unnecessary to discuss the effect of the receipt and conventional subrogation given to him by the bank on the second of

August, 1876. He was a creditor of Raymond on the twenty-ninth of June, 1876, by subrogation to the judgment of Andrew G. Downey. He paid the mortgage note to the bank on the first of July, 1876. Subrogation took place by effect of law. C. C. (old) 2157.

There is no proof that Billgery acted as Raymond's agent; that is satisfactory. It is conceded on all sides that it was Billgery's money that was paid, and the weight of evidence is largely in favor of his having done so in his own interest and behalf.

It is therefore ordered, adjudged, and decreed by the court that the judgment appealed from be affirmed with costs of both courts.